**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEFFREY C. BOWMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-185 |
| | ) | |
| CORPORAL JUDITH BURROUGHS, | ) | Judge Nora Barry Fischer |
| CAPTAIN ROBERT LIZIK, | ) | U.S. District Judge |
| CAPTAIN LISA CHRISTIE, and | ) | |
| COLONEL JEFFREY MILLER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.     Introduction**

This is an action involving a police officer who claims that he was discharged in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Pending before the Court is a motion for summary judgment filed by the Defendants. (Docket No. 52). For the reasons that follow, that motion will be granted in its entirety.

**II.     Factual Background**

Plaintiff Jeffrey C. Bowman ("Bowman") is an adult individual who resides in Aliquippa, Pennsylvania. (Docket Nos. 54 & 59 at ¶ 1). In October 1992, after serving in the military, Bowman became a police officer for the Pennsylvania State Police ("PSP"). (Docket No. 59 at ¶ 1). He began his career as a member of the patrol unit for Troop A, which is headquartered in Greensburg, Pennsylvania. (*Id.*). Three years later, he was selected to serve in the Executive

1

Service Section of the PSP, which is sometimes referred to as the Governor's detail. (*Id.*). He was subsequently transferred to the Criminal Investigation Unit of Troop D, which is headquartered in New Castle, Pennsylvania. (*Id.*).

Bowman was married in 1996. (Docket No. 52-3 at 8). By the summer of 2003, he and his wife had separated. (*Id.* at 17). In June 2003, while accessing an Internet chat room, Bowman became acquainted with Jodi Rusnak ("Jodi").[1] (Docket No. 59 at ¶ 3). After communicating with Bowman via email for approximately one week, Jodi invited Bowman to come to her house. (*Id.*). The two became romantically involved, and they had a sexual relationship for approximately eighteen months. (Docket No. 52-3 at 15-24).

In January 2005, Jodi's husband, Dale Rusnak ("Dale"), found out about Bowman's relationship with Jodi. (*Id.* at 24). Jodi called Bowman and told him that Dale had learned of their affair. (*Id.* at 24-25). The next day, Dale called Bowman on the telephone. (*Id.* at 25). Bowman apologized to Dale for having a sexual relationship with Jodi. (*Id.*). Although Bowman and Jodi did not continue to engage in sexual relations, they remained in contact with each other via email. Dale apparently discovered that they had continued to communicate with each other. (*Id.* at 30). This discovery prompted Dale to file an ethics complaint against Bowman. (*Id.*).

On April 26, 2005, Dale contacted the PSP's Bureau of Integrity and Professional Standards concerning Bowman's actions in relation to Jodi. (Docket No. 52-2 at 3). Dale alleged, among other things, that Bowman had engaged in sexual activity with Jodi while on duty

---

[1]The Court will refer to Jodi Rusnak by her first name in order to distinguish her from her husband, Dale Rusnak.

and sent sexually explicit emails to Jodi from his PSP email account.  (*Id.*).  Defendant Corporal Judith Burroughs ("Burroughs"), an investigator for the PSP's Internal Affairs Division ("IAD"), interviewed Bowman about Dale's complaint on July 18, 2005.  (*Id.* at 2-53).  Lieutenant Donald T. Carnahan ("Carnahan"), the commander of the IAD's Western Section, and Trooper Shawn P. Denham ("Denham"), Bowman's union representative, were present for this interview.  (*Id.* at 3).  On that occasion, Bowman admitted that he had accessed Jodi's personal email account without her knowledge or permission in order to monitor her communications with other men.  (*Id.* at 37-39).

On September 2, 2005, Defendant Captain Robert Lizik ("Lizik") signed a Disciplinary Action Report ("DAR") concerning Bowman's conduct.  (Docket No. 52-4 at 2).  In the DAR, Lizik stated that Bowman's accessing of Jodi's personal email account had constituted the "unlawful use of a computer" within the meaning of 18 PA. CONS. STAT. § 7611(a)(2), which is graded as a third-degree felony under Pennsylvania law.  (*Id.*).  On February 27, 2006, Bowman was informed that he had been accused of offenses for which he could be subject to a court-martial proceeding, and that he had the option of challenging the accusations through the grievance procedure rather than through the court-martial procedure.[2]  (*Id.* at 27).  Bowman elected to proceed in accordance with the grievance procedure.  (Doc. No. 59-4 at 2).  The next day, Lieutenant Byron L. Locke ("Locke") sent Bowman a memorandum informing him that he had been placed on "restricted duty status."  (*Id.* at 3, 9-10).  Bowman was prohibited from having contact with the Rusnaks, and he was not permitted to identify himself as a member of the

---

[2]Article 28, Section 11, of the applicable collective bargaining agreement provided Bowman with the option of challenging the accusations against him through either the grievance procedure or the court-martial procedure. (Docket No. 64-2 at 45-46).

PSP or otherwise act as a police officer when he was not on duty. *Id.* On March 30, 2006,

Bowman was suspended without pay. (*Id.* at 4). He was required to surrender his badge,

identification card and firearm. (*Id.*). With the concurrence of Defendant Colonel Jeffrey Miller

("Miller"), who was the Commissioner of the PSP, Defendant Captain Lisa Christie ("Christie")

recommended that Bowman's employment with the PSP be terminated. Bowman was informed

of his impending termination on April 6, 2006. (Docket No. 52-4 at 27-28). He invoked the

grievance procedure on April 17, 2006, challenging his dismissal on the ground that it had been

in violation of the applicable collective bargaining agreement.[3] (*Id.* at 28).

     Arbitration proceedings were conducted before Arbitrator William E. Caldwell

("Caldwell") on June 6, 2006, and July 11, 2006. (Docket No. 52-4 at 28; Docket No. 52-5 at 2-

30). In a decision dated August 23, 2006, Caldwell denied Bowman's grievance. (Docket No.

52-5 at 27-30). He concluded that Bowman's dismissal had been in conformity with the

collective bargaining agreement because Bowman's accessing of Jodi's personal email account

had been in violation of § 7611(a)(2).[4] (*Id.* at 29-30). The relevant language of the collective

bargaining agreement provided that an officer who had engaged in "any action that constitutes

the commission of a felony" should be terminated from employment with the PSP

"notwithstanding any mitigating circumstances." (Docket No. 52-4 at 20). Consequently,

---

     [3]Article 28, Section 12, of the collective bargaining agreement provided Bowman with a period of fifteen days within which to file his grievance. (Docket No. 64-2 at 47). His filing of a grievance eleven days after learning of his impending termination precluded the PSP from proceeding with the immediate implementation of the discharge decision. (*Id.*).

     [4]Under Article 28, Section 8, of the collective bargaining agreement, Caldwell was required to confine his inquiry to the precise issue submitted for arbitration. (Docket No. 64-2 at 44). He was called upon to determine whether the PSP had violated the collective bargaining agreement by discharging Bowman and, if so, what remedy was available to Bowman. (Docket No. 52-5 at 28). Since Caldwell concluded that the PSP's discharge decision had been in conformity with the collective bargaining agreement, there was no need for further inquiry concerning the availability of a remedy.

Bowman's employment with the PSP was terminated at midnight on August 23, 2006. (*Id.* at 28).

Bowman commenced this action against Burroughs, Lizik, Christie, Miller, Jodi and Dale on February 15, 2007. (Docket No. 1). He alleged that Burroughs, Lizik, Christie and Miller had violated his rights under the Due Process Clause of the Fourteenth Amendment, and that Lizik, Christie and Miller had violated his rights under the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶¶ 31-39). He asserted defamation claims arising under Pennsylvania law against the Rusnaks. (*Id.* at ¶¶ 40-44). In their answer to Bowman's complaint, the Rusnaks filed cross-claims against Burroughs, Lizik, Christie and Miller for contribution and indemnity. (Docket No. 21). On November 27, 2007, Bowman withdrew his claims against the Rusnaks. (Docket Nos. 41 & 42). The Rusnaks' cross-claims against Burroughs, Lizik, Christie and Miller were subsequently dismissed on December 3, 2007. (Docket No. 45).

On April 30, 2008, Burroughs, Lizik, Christie and Miller filed a motion for summary judgment. (Docket No. 52). Bowman replied on June 6, 2008, filing a brief in opposition to the motion for summary judgment. (Docket No. 58). Three days later, the United States Supreme Court issued its decision in *Engquist v. Oregon Department of Agriculture*, 128 S.Ct. 2146, 2148-2149 (2008), holding that the "class of one" theory of equal protection previously recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), "has no place in the public employment context." On July 28, 2008, the Court ordered the parties to file supplemental briefs concerning the applicability of *Engquist* to this case. (Docket No. 60). Bowman and the Defendants filed their supplemental briefs on August 15, 2008, and September 5, 2008, respectively. (Docket Nos. 61 & 62). On October 30, 2008, the Court ordered the Defendants to

file supplemental information regarding the terms of the applicable collective bargaining agreement. (Docket No. 63). The Defendants filed this supplemental information on November 19, 2008. (Docket No. 64). Pursuant to a subsequent order of the Court dated November 26, 2008, the Defendants and Bowman filed additional briefs on December 5, 2008, and December 24, 2008, respectively. (Docket Nos. 65, 66 & 68). The motion for summary judgment filed by the Defendants is the subject of this memorandum opinion.

## III.    Standard of Review

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* Pursuant to Federal Rule of Civil Procedure 56(c), the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the non-moving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the

admissible evidence contained in the record would be insufficient to carry the non-moving

party's burden of proof. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden,

the burden shifts to the non-moving party, who must go beyond his or her pleadings and

designate specific facts by the use of affidavits, depositions, admissions or answers to

interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324.

The non-moving party cannot defeat a well supported motion for summary judgment by simply

reasserting unsupported factual allegations contained in his or her pleadings. *Williams v.*

*Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

**IV.** **Discussion**

Bowman brings his claims pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress, except that in
> any action brought against a judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable. For
> purposes of this section, any Act of Congress applicable exclusively to the District
> of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. This statute does not create substantive rights. *Maher v. Gagne*, 448 U.S.

122, 129, n. 11 (1980). Consequently, a plaintiff cannot prevail in an action brought under §

1983 without establishing an underlying violation of a federally-protected right. *Collins v. City*

*of Harker Heights*, 503 U.S. 115, 119 (1992). "Section 1983 itself contains no state-of-mind

requirement independent of that necessary to state a violation of the underlying federal right."

*Board of County Commissioners v. Brown*, 520 U.S. 397, 405 (1997)(internal quotation marks omitted).

Although the statutory language of § 1983 speaks of no immunities, the United States Supreme Court has always assumed that Congress would have expressly made common-law immunities inapplicable to § 1983 actions within the language of the statute if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-555 (1967). For this reason, the "qualified immunity" that was available to state officials at common law is available to defendants such as Burroughs, Lizik, Christie and Miller. *Kalina v. Fletcher*, 522 U.S. 118, 131-135 (1997)(Scalia, J., concurring). As a general matter, government officials performing discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). State officials can be on notice that their conduct violates clearly established federal law even under novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is because "general statements of law are not inherently incapable of giving fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997). In order for a federally protected right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is not merely a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(per

curiam).

In support of their motion for summary judgment, the Defendants argue that they are entitled to qualified immunity. (Docket No. 53 at 5-10). The question of qualified immunity, however, cannot be confronted without a threshold determination as to whether Bowman can establish an underlying violation of a federally-protected right in the first place. In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the framework that must be employed by a court in determining whether a particular defendant is entitled to qualified immunity. Speaking through Justice Kennedy, the Supreme Court explained that a court evaluating a defendant's claim of qualified immunity must first decide whether the plaintiff can establish an actionable violation of federal law. *Saucier*, 533 U.S. at 200-201.

Since this issue is before the Court at the summary judgment stage, the relevant question is whether Bowman has presented sufficient evidence to enable a reasonable jury to conclude that the Defendants violated his rights under the Fourteenth Amendment when they terminated his employment with the PSP. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). If this question is answered in the affirmative, the next question for consideration is whether the rights asserted by Bowman were clearly established at the time of the alleged constitutional violations. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The dispositive question is whether it would have been clear to reasonable officers in the position of Burroughs, Lizik, Christie and Miller that their conduct was unlawful under the particular circumstances that they confronted. *Id.* at 202. The standard is objective, viewing the relevant circumstances from the perspective of an objectively reasonable officer. *Showers v. Spangler*, 182 F.3d 165, 171-172 (3d Cir. 1999). "As the

qualified immunity defense has evolved, it provides ample protection to all but the plainly

incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341

(1986).

With that in mind, the Court now turns to the threshold question of whether Bowman can

establish an underlying violation of a federally-protected right. The federal rights upon which

Bowman bases his claims arise under the Fourteenth Amendment. Section 1 of the Fourteenth

Amendment provides:

> All persons born or naturalized in the United States and subject to the jurisdiction
> thereof, are citizens of the United States and of the State wherein they reside. No
> State shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States; nor shall any State deprive any person
> of life, liberty, or property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

U.S. CONST., AMEND. XIV, § 1. Bowman contends that his rights under the Due Process and

Equal Protection Clauses were violated when he was discharged. The Court will address the

application of each of these constitutional provisions seriatim.

A.       **The Due Process Clause**

The Due Process Clause of the Fourteenth Amendment, by its clear terms, prohibits a

State from depriving a person of "life, liberty, or property, without due process of law." U.S.

CONST., AMEND. XIV, § 1. Claims arising thereunder, however, can take different forms.

Although the text of the Due Process Clause focuses on the *process* by which an individual can

be lawfully deprived of a liberty or property interest, it is firmly established that the

constitutional provision bars certain governmental actions "regardless of the fairness of the

procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The

Supreme Court has construed the Due Process Clause to incorporate some of the specific provisions contained in the Bill of Rights, thereby making them applicable to the States. *Albright v. Oliver*, 510 U.S. 266, 272-275 (1994)(plurality opinion). The Due Process Clause has also been construed to provide "heightened protection against governmental interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Due process protection in the "substantive sense" limits what a State may do in both its legislative and executive capacities. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In this case, however, Bowman relies on neither a particular provision of the Bill of Rights nor the more generalized notion of substantive due process. The plain language of his complaint indicates that his claims are premised on a theory of *procedural* due process. (Docket No. 1 at ¶¶ 31-36). In a procedural due process case concerning the discharge of a public employee, the inquiry can be broken down into two discrete components. The first question for consideration is whether the employee "possessed a protected interest giving rise to due process protection." *Garcia v. City of Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000). If that question yields a positive answer, the second question for consideration is whether the public employer afforded the employee "an appropriate level of process" in terminating his or her employment. *Id.* These two questions directly track the language of the Due Process Clause. The first question focuses on whether the government has deprived the employee of "life, liberty, or property," while the second question focuses on whether the applicable deprivation was effected "without due process of law." U.S. CONST., AMEND. XIV, § 1.

As the Supreme Court declared in *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972), "the range of interests protected by procedural due process is not infinite." "The requirements of

procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Roth*, 408 U.S. at 569. Public employment is certainly a "benefit," but not all benefits constitute "property" within the meaning of the Due Process Clause. Speaking through Justice Stewart, the Supreme Court made the following observations in *Roth*:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577. In the public employment context, an employee has a "legitimate claim of entitlement" to his or her job where he or she can be discharged only for cause. *Gilbert v. Homar*, 520 U.S. 924, 928-929 (1997).

The parties do not appear to dispute that Bowman had a constitutionally protected property interest in his continued employment with the PSP. Pennsylvania law provides for an arbitration procedure to address impasses occurring during the collective bargaining process between a public employer and its policemen. 43 Pa. Stat. § 217.4. This procedure was invoked after the pre-existing collective bargaining agreement for members of the PSP expired on July 1, 2004. (Docket No. 52-4 at 5). The arbitration process resulted in a new collective bargaining agreement that was in effect from July 1, 2004, through June 30, 2008. (*Id.* at 7). Bowman, of course, was terminated during that period of time. "Appendix A" of the collective bargaining agreement provided that members of the PSP "should be subject to disciplinary action only for 'just cause.'" (*Id.* at 20). It is clear from the language of Appendix A that "termination of employment" constituted "discipline" within the meaning of the collective bargaining

agreement.  (*Id.*).  Since the collective bargaining agreement provided that police officers could be disciplined (i.e., terminated) only for "just cause," Bowman had a property interest in his continued employment.[5]  Consequently, he suffered a "deprivation" of "property" within the meaning of the Due Process Clause when he was discharged.

A deprivation of property having been established, the Court must consider whether the deprivation at issue was effected "without due process of law."  "Nothing in [the Fourteenth] Amendment protects against all deprivations of life, liberty, or property by the State.  The Fourteenth Amendment protects only against deprivations 'without due process of law.'" *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327, 328-331 (1986).  The essential requirements of due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner.  *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 545-548 (1985).  The standard for determining *what* process is due in a particular situation is flexible.  The very nature of the due process inquiry eschews reliance on inflexible requirements in favor of an approach which accounts for the precise factual circumstances of the situation at issue.  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  In *Matthews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court delineated the factors that must be considered in determining the "appropriate level of process" in a particular situation:

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

[5]Property interests are not created by the Constitution.  Instead, they are created by an independent source such as state law.  *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985).

and administrative burdens that the additional or substitute procedural
requirement would entail.

*Matthews*, 424 U.S. at 334-335.  The second factor mentioned in *Matthews* focuses on the

accuracy of the decisionmaking process at issue, as well as on the potential accuracy of any

feasible alternative procedures.

The constitutional mandate of due process, however, is not a substantive guarantee that

the "process" involved will necessarily yield an accurate result.  The *fairness* of the procedure,

and not the *result* of the procedure, is what matters.  In *Fuentes v. Shevin*, 407 U.S. 67 (1972),

the Supreme Court explained:

> The requirement of notice and an opportunity to be heard raises no impenetrable
> barrier to the taking of a person's possessions.  But the fair process of decision-
> making works, by itself, to protect against arbitrary deprivation
> of property.  For when a person has an opportunity to speak up in his own defense,
> and when the State must listen to what he has to say, substantively unfair and
> simply mistaken deprivations of property interests can be prevented.

*Fuentes*, 407 U.S. at 81.  While one of the purposes of due process is to prevent erroneous

deprivations of property, an erroneous deprivation *itself* does not constitute a violation of the Due

Process Clause.  This is clear in light of the Supreme Court's decision in *Carey v. Piphus*, 435

U.S. 247 (1978).  In *Carey*, the Supreme Court held that "[b]ecause the right to procedural due

process is 'absolute' in the sense that it does not depend upon the merits of a claimant's

substantive assertions," a denial of procedural due process is actionable under § 1983 for

nominal damages without proof of actual injury.  *Carey*, 435 U.S. at 266.  This is true even if the

"deprivation" at issue would still have occurred with appropriate procedural protections in place.[6] The converse, however, is also true. Just as a "correct decision" to deprive an individual of property is unconstitutional if the government does not provide "due process of law," an "incorrect decision" to deprive him or her of property is constitutionally permissible if "due process of law" is properly provided. *Harris v. City of Akron*, 20 F.3d 1396, 1404 (6th Cir. 1994).

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court recognized that, in the public employment context, pre-termination hearings can serve two distinct purposes. The first purpose served by a pre-termination hearing is to permit the employee to present his or her view of the facts, thereby increasing the chances of "an accurate decision" with respect to any disputed factual questions. *Loudermill*, 470 U.S. at 543. The second purpose served by such a hearing is to give the employee an opportunity "to invoke the discretion" of the person responsible for making the termination decision in a situation where "the appropriateness or necessity of the discharge" is subject to dispute. *Id.* A close examination of the record reveals that neither of these purposes could have been furthered by additional procedures in this case. In this case, it is clear that Bowman was provided with an opportunity to be heard by way of the grievance and arbitration procedures available to members of the PSP. Similar procedures have been found to be in conformity with the requirements of the Due

---

[6]A determination that the "deprivation" at issue would still have occurred does not necessarily mean that only nominal damages are available to the plaintiff. If a plaintiff can show that he or she suffered actual injury because of the denial of due process (i.e., emotional distress caused not by the "deprivation" itself, but rather by the lack of due process in connection with that deprivation), he or she can recover compensatory damages. *Zinermon v. Burch*, 494 U.S. 113, 126, n. 11 (1990). Where a deprivation would have occurred regardless of whether due process was provided, it cannot be said that the lack of due process *caused* the deprivation in question. *Carey v. Piphus*, 435 U.S. 247, 260 (1978). Nevertheless, where an individual's anguish is caused by the unconstitutional nature of the deprivation, rather than by the deprivation itself, there is a causal relationship between the constitutional violation and the damages suffered by the plaintiff. *Id.* at 263-264.

Process Clause.  *Dykes v. Southeastern Pennsylvania Transportation Authority*, 68 F.3d 1564, 1571-1572 (3d Cir. 1995).  In truth, it is not clear to the Court *what* additional *process* Bowman believes to have been necessary.

At the time of Bowman's discharge, Appendix A of the applicable collective bargaining agreement provided, in pertinent part, as follows:

> Certain conduct immediately and absolutely threatens the integrity of the Department's public duty and responsibility.  In the following circumstances, the proper level of discipline is termination of employment, notwithstanding any mitigating circumstances.  Such conduct includes, but is not limited to, the following:
> [1] Engaging in any action that constitutes the commission of a felony or a misdemeanor which carries a potential sentence of more than one (1) year, or in any action that constitutes the commission of an equivalent offense in another jurisdiction, state, or territory.  Neither a criminal conviction nor the pendency of criminal charges is necessary for disciplinary action in such circumstances.  In addition, a declination of prosecution shall not preclude disciplinary action.

(Docket No. 52-4 at 20).  Bowman's employment with the PSP was terminated on August 23, 2006, because Caldwell determined that Bowman had violated § 7611(a)(2).  (Docket No. 52-5 at 27-30).

Bowman correctly notes that he was required to avail himself of the remedies available to him under the collective bargaining agreement.  *Reilly v. City of Atlantic City*, 532 F.3d 216, 235 (3d Cir. 2008).  He goes on to argue that the grievance procedure did not afford him due *process* of law because Caldwell's *conclusion* that he had violated § 7611(a)(2) was not supported by "the wording of the statute" or "the facts surrounding this case."  (Docket No. 58 at 9).  His argument rests on the flawed premise that the adequacy of the *process* at issue somehow depends on the *conclusion* yielded by that process.  Even if the Court were to assume *arguendo* that

Caldwell's conclusion resulted from an erroneous construction of the Pennsylvania statute, it would not follow that a procedural due process violation has occurred. A plaintiff cannot establish a violation of the Due Process Clause merely by showing that the process in question has produced a determination that is erroneous as a matter of state law. *Gryger v. Burke*, 334 U.S. 728, 731 (1948)("We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question."); *Wood v. Conneaut Lake Park, Inc.*, 386 F.2d 121, 125 (3d Cir. 1967)("When the parties have been fully heard in the regular course of judicial proceedings, an erroneous decision of the state court does not deprive the unsuccessful party of his property without due process of law."). If it were otherwise, every error of state law could be bootstrapped into a procedural due process claim. *Sutton v. Marianna School District A*, 573 F.Supp. 159, 165 (E.D.Ark. 1983).

It is axiomatic that an impartial decisionmaker is an essential element of "due process." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775-777 (2002). It may be true that, in some instances, an egregiously erroneous determination may be so unsupportable in law or fact as to *itself* constitute evidence of an impermissible bias on the part of the decisionmaker. The Court is not faced with such a situation. Caldwell's conclusion is amply supported by the record.[7]

The primary purpose of due process is to provide for an accurate determination of the

---

[7]The Court does not mean to suggest that Bowman would necessarily succeed in establishing a violation of the Due Process Clause if he could show that Caldwell's ultimate determination was unsupported by the record. The Court need not address that issue, since the support in the record for Caldwell's determination that Bowman had violated § 7611(a)(2) belies Bowman's apparent belief that an allegedly unconstitutional *process* somehow led to an incorrect *conclusion*.

*facts* at issue. *Loudermill*, 470 U.S. at 543. In this case, the material facts are not in dispute. On July 18, 2005, Burroughs interviewed Bowman about his relationship with Jodi. (Docket No. 52-2 at 2-53). On that occasion, Bowman admitted that he had accessed Jodi's personal email account in order to monitor her communications with other men. (*Id.* at 37-39). He stated that he had not altered or deleted any messages in her account. (*Id.*). In a deposition on November 14, 2007, Bowman described his intrusions into Jodi's email account in greater detail. He testified as follows:

> Q.     Mr. Bowman, at some point did you break into Jodi Rusnak's personal e-mail account?
>
> A.     Yes.
>
> Q.     Can you explain for me what you did to cause that to happen.
>
> A.     At some point during our relationship, I just grew suspicious of Jodi and her activities. Out of that suspicion, I decided that I would make an attempt to guess at her password to her Yahoo e-mail account in order to satisfy my suspicions.
>
> Q.     This time frame you're talking about when you became suspicious about the actions of Jodi Rusnak, what time are we talking about?
>
> A.     The fall of 2003, within the first several months of our relationship, I believe.
>
> Q.     The fall of 2003? When you say you became suspicious about the acts of Jodi, what do you mean by that? What caused you to be suspicious?
>
> A.     Jodi's own statements to me about her extra-marital affairs prior to me and just an overall feeling of something wasn't quite right in our relationship. I guess when you're in a relationship, you might get a feeling that something is not quite right. Based on the knowledge that I had that I received from Jodi, I knew that she had a number of men who were in contact with her, and my suspicions rose.
>
> Q.     Let me make sure I'm understanding this correctly. You were in an extra-

marital affair. Are you saying that there's something that caused you to be suspicious about the relationship outside of the fact that in [sic] you were in an extra-marital affair?

A.     Yes. I was in an extra-marital affair, wondering if my girlfriend, who was married, was having an affair.

Q.     Then that caused you to try to and actually succeed in breaking into her personal e-mail account through Yahoo?

A.     Yes.

Q.     Where did you attempt to and succeed in breaking through and into her personal e-mail account? Where did you do that from?

A.     I was at work.

Q.     You worked with the Pennsylvania State Police?

A.     Yes.

Q.     You did that with a Pennsylvania State Police computer?

A.     Yes.

Q.     Now, you indicated that to do that, you had to make guesses at her password?

A.     I made one guess.

Q.     All right. That's all you need to do to break into someone's personal e-mail account on Yahoo, is just to simply use their password and then you gain access to that e-mail account?

A.     Yes. I didn't have any other computer technology or abilities to hack into something. It was a guess at a password.

Q.     What caused you to guess at the password? Did you have some inside information?

A.     It was her dog's name.

Q.     Her dog's name? Did you have some prior conversation with Jodi about

what her password was or--

A.    We were at her house on a particular occasion.  I think we were reading a magazine that was sitting on the coffee table.  I think it was a Maxim.  You know, they're full of abstract facts.  One of the facts had something to do with 70 percent of women use their pet's name as their password.  I just kind of gave her an "uh-huh," and she just kind of gave me a look that I felt at that point that–I just kind of thought, well, that's probably her password.  Her dog's name is Trixie.

Q.    Just so that I'm clear, at no point did Jodi ever give you permission or the right to access her personal e-mail account through Yahoo?

A.    No.

Q.    Once you were able to access her personal e-mail account through Yahoo, did you actually read her personal e-mails?

A.    Yes.

Q.    What else did you do?

A.    I printed out a few e-mails that were from other men and used them to confront Jodi about her untruthfulness, I guess, to me.

Q.    How did you go about doing that?

A.    I mailed them to myself.  I kind of devised a quick little scheme of, okay, how can I use this information without looking like a creep who went into her e-mail, was that suspicious or was that untrusting.  So I mailed them to myself, and I told her that I got these at work.  I showed her the e-mails, and I used that information to end the relationship.

Q.    Did you tell Jodi that someone just anonymously mailed these e-mails to you at work?

A.    Yes.

Q.    Did you actually have an envelope where you actually mailed them to yourself anonymously?

A.    Yes.

Q.     So you lied to Jodi about how you got the e-mails?

A.     Yes.

Q.     Where did you confront Jodi about those e-mails?

A.     McConnells Mill State Park, which is near the border of Lawrence County
       and Butler County.

(Docket No. 52-3 at 45-49).

Bowman has supplemented his deposition testimony with an affidavit dated June 6, 2008.

(Docket No. 59-11 at 1-3). In his affidavit, Bowman stated that, when he "accessed" Jodi's

email account, he had "no intention" of altering, damaging or destroying any computer or

computer system. (*Id.* at 1, ¶ 3). He further declared that he had not deleted or altered any of

Jodi's email entries. (*Id.* at 1, ¶ 4).

The record contains a declaration by Thomas J. Rozman ("Rozman"), an Assistant

Counsel for the PSP's Office of Chief Counsel, dated April 29, 2008. (Docket No. 52-5 at 32-

33). In the declaration, Rozman stated that Christie had asked him to render a legal opinion as to

whether Bowman's conduct concerning Jodi's email account had been in violation of §

7611(a)(2). (*Id.* at 33, ¶¶ 4-5). He further declared that he had informed Christie that, in his

view, Bowman had violated § 7611(a)(2), thereby prompting Christie to recommend that

Bowman's employment with the PSP be terminated.[8] (*Id.* at 33, ¶¶ 6-8).

---

[8]The Court mentions Rozman's declaration solely for the purpose of establishing that Christie did, in fact, act on the advice of Rozman in recommending that Bowman be discharged, and not for the purpose of establishing that Bowman's conduct constituted a violation of § 7611(a)(2). In support of his argument that he did not violate § 7611(a)(2), Bowman has presented a report authored by Douglas Goldhaber ("Goldhaber"), a former Public Defender for Bedford County, Pennsylvania. (Docket No. 59-10). In his report, Goldhaber opined that Bowman had not violated § 7611(a)(2) by accessing Jodi's email account. (*Id.* at 3). Goldhaber's report, however, does not constitute factual evidence. Instead, it consists merely of legal conclusions and arguments akin to those contained in the briefs submitted by counsel for the parties. *VIM, Inc. v. Somerset Hotel Association*, 19 F.Supp.2d 422, 427, n. 4

On July 28, 2005, just ten days after her interview with Bowman, Burroughs sent

Lawrence County District Attorney Matthew T. Mangino ("Mangino") a letter seeking

clarification as to whether Bowman had violated § 7611(a)(2), and as to whether Mangino

intended to initiate a criminal prosecution against Bowman.  (Docket No. 59-4 at 11).  That same

day, Jodi sent Burroughs the following message by way of email:

> I do not wish to file any criminal charges against trooper Jeffrey C. Bowman.
>
> It has been brought to my attention that he claims to have entered my email
> account at some point during the relationship between he and I.  I never gave him
> permission at any time to enter my email account for any reason.
>
> I do wish for this information to be included in the ongoing administrative
> investigation.

(*Id.* at 12).  In a letter to Burroughs dated August 3, 2005, Mangino stated as follows:

> I have reviewed your correspondence dated July 28, 2005 with regard to
> the above referenced matter.  I have also reviewed the executed administrative
> warnings dated July 18, 2005, your report dated July 28, 2005, and your e-mail of
> July 29, 2005.
>
> Based on the information that I have reviewed our office will not authorize
> a criminal prosecution against Trooper Bowman.  The criminal investigation of
> this matter is now closed.
>
> If you have any questions or need any additional information, please do
> not hesitate to contact me.

--------

(W.D.Pa. 1998).  There are, of course, circumstances where a legal expert's opinion can be offered as factual
evidence.  *Schmidt v. Currie*, 470 F.Supp.2d 477, 483-484 (E.D.Pa. 2005).  Nevertheless, such circumstances are not
present in this case.  It is the province of the Court to determine the meaning and scope of the applicable law.  *United
States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008)("The 'expert' would have testified about the meaning of the
statute and regulations.  That's a subject for the court, not for testimonial experts."); *Burkhart v. Washington
Metropolitan Area Transit Authority*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)("Each courtroom comes equipped with
a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal
standards.").  As always, the Court's decisionmaking process is informed by the arguments raised by counsel for the
parties.  Nonetheless, these arguments do not constitute factual evidence.  It is for the Court, and not the finder of
fact, to determine the merits of such legal arguments.  Accordingly, the Court does not regard Goldhaber's report as
factual evidence in this case.

(*Id.* at 13).  Mangino's letter did not address the question of whether Bowman's conduct had

constituted a crime.  It simply stated that no prosecution would be forthcoming.  It is not clear to

the Court whether Mangino knew about Jodi's preference that no criminal charges be filed

against Bowman when he decided not to initiate criminal proceedings.[9]

Bowman relies on Mangino's decision not to prosecute him as a basis for arguing that the

PSP had no basis for discharging him.  (Docket No. 58 at 11).  Mangino's decision not to

prosecute Bowman, however, is of little relevance to the question of whether Bowman should

have been allowed to remain employed by the PSP.  Appendix A of the collective bargaining

agreement expressly stated that "[n]either a criminal conviction nor the pendency of criminal

charges [wa]s necessary for disciplinary action," and that "a declination of prosecution [would]

not preclude disciplinary action."  (Docket No. 52-4 at 20).  Moreover, Jodi expressly stated in

her email to Burroughs that she wanted Bowman's unauthorized accessing of her email account

"to be included in the ongoing administrative investigation" into Bowman's conduct even though

she expressed a preference against the initiation of criminal proceedings.  (Docket No. 59-4 at

12).  It is clear that one who engages in the unlawful use of a computer may suffer consequences

other than a criminal prosecution.  *M.T. v. Central York School District*, 937 A.2d 538, 539-543

(Pa.Commw.Ct. 2007).

With that in mind, the Court now turns to the legislative history of § 7611(a)(2).  This

---

[9]Like most jurisdictions, Pennsylvania recognizes that a prosecutor has discretion not to prosecute an
individual even where it appears that a conviction could be obtained.  *Commonwealth v. McGinley*, 673 A.2d 343,
344-347 (Pa.Super.Ct. 1996).  The mere fact that Mangino declined to prosecute Bowman does not mean that
Bowman did not commit a crime.

statutory prohibition, which was previously codified at 18 Pᴀ. Cᴏɴs. Sᴛᴀᴛ. § 3933(a)(2), was

originally enacted in 1983. At that time, it read as follows:

> **§ 3933. Unlawful use of computer.**
> **(a) Offense defined.–**A person commits an offense if he:
>
> ***
> (2) intentionally and without authorization accesses, alters, damages or destroys
> any computer, computer system, computer network, computer software, computer
> program or computer data base or any part thereof.

1983 Pa. Laws 67, § 1. The word "access" meant "[t]o instruct, communicate with, store data in,

retrieve data from or otherwise make use of any resources of a computer, computer system or

computer network." *Id.* In 1986, the Pennsylvania Legislature amended § 3933(a)(2) to insert

the phrase "interferes with the operation of" between the words "alters" and "damages." 1986

Pa. Laws 164, § 1. The word "intercept" was added between the words "to" and "instruct"

within the definition of the term "access," and the term "data base" was added as an alternative to

the terms "computer," "computer system" and "computer network." *Id.* In 2000, the prefatory

language contained in § 3933(a) was amended to clarify that a person committed an offense if he

or she engaged in conduct proscribed under § 3933(a)(2) regardless of whether he or she acted

"in person, electronically or through the intentional distribution of a computer virus." 2000 Pa.

Laws 24, § 1.

The statutory prohibition was revised again in 2002, when it was recodified at 18 Pᴀ.

Cᴏɴs. Sᴛᴀᴛ. § 7611(a)(2). 2002 Pa. Laws 226, § 3. In its present form, § 7611(a)(2) provides:

> **§ 7611. Unlawful use of computer and other computer crimes**
> **(a) Offense defined.–**A person commits the offense of unlawful use of a
> computer if he:

\*\*\*
(2) intentionally and without authorization accesses or exceeds authorization to access, alters, interferes with the operation of, damages or destroys any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunications device or any part thereof[.]

18 PA. CONS. STAT. § 7611(a)(2). Significantly, the Pennsylvania Legislature added the phrase "or exceeds authorization to access" after the verb "accesses" when it reenacted the proscription. This revision evinces a legislative intent to broaden the category of conduct for which one could be convicted for "accessing" computer-related "data" or "resources." The word "access" means "[t]o intercept, instruct, communicate with, store data in, retrieve data from or otherwise make use of any resources of a computer, computer system, computer network or database." 18 PA. CONS. STAT. § 7601. Pennsylvania law grades an offense under § 7611(a) as a felony of the third degree. 18 PA. CONS. STAT. § 7611(b).

The Pennsylvania courts adhere to the rule that while criminal prohibitions must be strictly construed, "courts are not required to give words of a criminal statute their narrowest meaning or disregard evident legislative intent." *Commonwealth v. Wooten*, 545 A.2d 876, 880 (Pa. 1988). The Court's review of the jurisprudence concerning § 7611(a)(2)'s statutory predecessors illustrates that a police officer's use of computer-related materials for improper purposes was most likely within the category of prohibited conduct envisioned by the Pennsylvania Legislature when it enacted § 7611(a)(2). *Commonwealth v. McFadden*, 850 A.2d 1290, 1291-1294 (Pa.Super.Ct. 2004). The terms "computer,"[10] "computer system,"[11] "computer

---

[10]The term "computer" is defined as "[a]n electronic, magnetic, optical, hydraulic, organic or other high-speed data processing device or system which performs logic, arithmetic or memory functions and includes all input, output, processing, storage, software or communication facilities which are connected or related to the device in a

network"[12] and "database"[13] appearing in the statutory language have been broadly construed by the Pennsylvania courts. *Commonwealth v. Delapaz*, 796 A.2d 364, 365-366 (Pa.Super.Ct. 2002).

At the arbitration proceeding before Caldwell on July 11, 2006, Trooper William Erdely ("Erdely") testified that Jodi's email account, which had been "accessed" by Bowman without Jodi's authorization, was an Internet-based email account. (Docket No. 52-5 at 13). In *Commonwealth v. Murgallis*, 753 A.2d 870, 871 (Pa.Super.Ct. 2000), the Pennsylvania Superior Court held that the Internet was a "computer network" within the meaning of § 7611(a)(2)'s statutory predecessor. At that time, the term "computer network" was defined in the same way in which it is defined in the current version of the statute. 1986 Pa. Laws 164, § 1. The Superior Court also construed the word "access" broadly enough to encompass the sending of an electronic message by means of an Internet-based email account. *Murgallis*, 753 A.2d at 872.

In his affidavit of June 6, 2008, Bowman stated as follows:

1.    I was terminated by the Pennsylvania State Police due to allegations that I wrongfully accessed Jodi Rusnak's electronic mail account.

2.    I accessed Jodi's email account, because I wanted to see if she was communicating with other men.

---

system or network." 18 PA. CONS. STAT. § 7601.

[11]The term "computer system" is defined as "[a] set of related, connected or unconnected computer equipment, devices and software." 18 PA. CONS. STAT. § 7601.

[12]The term "computer network" is defined as "[t]he interconnection of two or more computers through the usage of satellite, microwave, line or other communication medium." 18 PA. CONS. STAT. § 7601.

[13]The term "database" is defined as "[a] representation of information, knowledge, facts, concepts or instructions which are being prepared or processed or have been prepared or processed in a formalized manner and are intended for use in a computer, computer system or computer network, including, but not limited to, computer printouts, magnetic storage media, punched cards or data stored internally in the memory of the computer." 18 PA. CONS. STAT. § 7601.

3.      When I accessed her account, I had no intention of altering, damaging, destroying any computer or computer system.

4.      When I accessed her account, I did not delete any of her email entries or alter them in any way.

(Docket No. 59-11 at 1, ¶¶ 1-4).

By his own admission, Bowman "accessed" Jodi's email account. It is undisputed that he did so without her permission.[14] The statutory language provides that "[a] person commits the offense of unlawful use of a computer if he . . . intentionally and without authorization accesses or exceeds authorization to access, alters, interferes with the operation of, damages or destroys any . . . computer network . . . or any part thereof." 18 PA. CONS. STAT. § 7611(a)(2). It is clear that the Pennsylvania Legislature's use of the word "or" within the language of the statute makes the prohibition disjunctive rather than conjunctive. *Commonwealth v. Gerulis*, 616 A.2d 686, 693-694 (Pa.Super.Ct. 1992). It was not necessary for Bowman to "alter," "damage" or "destroy" a "computer network," or "any part" of a computer network, in order to commit the offense of unlawful use of a computer. *Id.* at 693 ("When a criminal statute criminalizes two separate actions or intents, the Commonwealth need only prove one."). The offense is completed as soon as one "intentionally and without authorization accesses or exceeds authorization to access . . . any . . . computer network . . . or any part thereof." 18 PA. CONS. STAT. § 7611(a)(2). One "accesses" a computer network when he or she "make[s] use of any resources of a . . .

_____

[14]In her July 28, 2005 email to Burroughs, Jodi stated that she had never given Bowman permission to enter her email account. (Docket No. 59-4 at 12). In his deposition, Bowman testified that Jodi had not given him permission to access her email account. (Docket No. 52-3 at 48). Consequently, it is clear that there is no dispute as to this issue.

computer network . . . ." 18 PA. CONS. STAT. § 7601.  Since Bowman intentionally[15] "accessed"

Jodi's Internet-based email account "without authorization," his conduct appears to fall neatly

within the category of conduct prohibited under § 7611(a)(2).

For decades, it has been firmly established that when the parties to a dispute have been

fully and fairly heard on a matter, an erroneous decision does not deprive the unsuccessful party

of his or her property "without due process of law."  *Bonner v. Gorman*, 213 U.S. 86, 91 (1909).

In this case, Caldwell's determination that Bowman's conduct had constituted a violation (or

multiple violations) of § 7611(a)(2) appears to have been based on a correct construction of the

statute.  Even if the Court is mistaken with respect to the scope of § 7611(a)(2), it is clear that

Bowman cannot establish a violation of the Due Process Clause.  He has presented no evidence

to support the idea that the *process* by which he was deprived of his position with the PSP was so

arbitrary or unfair as to run afoul of the Fourteenth Amendment.[16]  Moreover, it cannot be said

that Caldwell's construction of § 7611(a)(2) was so "unexpected and indefensible by reference to

the law which had been expressed prior to the conduct in issue" as to constitute a violation of the

---

[15]Under Pennsylvania law, "[a] person acts intentionally with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist."  18 PA. CONS. STAT. § 302(b)(1).

[16]The only apparent mention of unfair *procedures* in Bowman's brief is a vaguely worded reference to the PSP's alleged failure to adequately evaluate Jodi's credibility.  (Docket No. 58 at 12-13).  In his complaint, Bowman alleges that Jodi made false allegations against him.  (Docket No. 1 at ¶¶ 25-26).  As noted earlier, Bowman has already withdrawn his defamation claims against Jodi and Dale.  (Docket Nos. 41 & 42).  Therefore, the Court need not dwell on what Jodi said about Bowman.  To the extent that Bowman contends that the fairness of his disciplinary and grievance procedures was compromised by false allegations made by Jodi, the Court finds his argument to be without merit.  In his deposition, Bowman acknowledged that he had been discharged solely for illegally accessing Jodi's email account.  (Docket No. 52-3 at 44).  By Bowman's own admission, the discharge decision was not based on any allegedly false allegations made by Jodi.  (*Id.*).  Bowman affirmatively admitted to accessing Jodi's email account without her authorization.  (*Id.* at 45-49).  It is difficult to fathom how a greater focus on the credibility of Jodi could have enhanced the fairness of the disciplinary and grievance proceedings.  With respect to the material factual issues, the accounts relayed to the PSP by Bowman and Jodi were no different.

Due Process Clause. *Rogers v. Tennessee*, 532 U.S. 451, 462 (2001); *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964).

There is one point that the parties appear to have overlooked. The language of the collective bargaining agreement indicates that the provisions of Appendix A "are effective for discipline arising out of any conduct occurring, in full or in part, on or after January 1, 2005." (Docket No. 64-3 at 20). In the interview conducted by Burroughs on July 18, 2005, Bowman admitted that he had accessed Jodi's personal email account, without her authorization, "sometime" during his relationship with her. (Docket No. 52-2 at 38). In his deposition of November 14, 2007, Bowman testified that he had accessed Jodi's personal email account during the fall of 2003. (Docket No. 52-3 at 45). Caldwell's arbitral decision was rendered on August 23, 2006. (Docket No. 52-5 at 27-30). At the time of Caldwell's decision, Bowman had not yet specified exactly when he had accessed Jodi's email account. It appears from the evidence of record that the conduct for which Bowman was terminated may have occurred prior to January 1, 2005, which was the effective date of Appendix A.

On November 26, 2008, the Court ordered the parties to file supplemental briefs "addressing the applicability of Appendix A to Bowman's conduct." (Docket No. 65 at 1). Although the parties subsequently filed supplemental briefs in accordance with that order, they did not observe that the effective date of Appendix A appears to have postdated the conduct for which Bowman was terminated. (Docket Nos. 66 & 68). Since Bowman is the party seeking relief, he must articulate a legal basis for establishing a violation of the Due Process Clause. *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or

factual, why summary judgment should not be entered."). The apparent discrepancy between the timing of Bowman's conduct and the effective date of Appendix A appears to have eluded all of the parties involved, including the relevant decisionmakers. It is not entirely clear whether Appendix A was designed to create new standards or to simply enumerate preexisting, unwritten standards. Nevertheless, Bowman does not argue that the Defendants violated his rights under the Due Process Clause by applying Appendix A retroactively. Instead, he focuses his arguments solely on Caldwell's construction of § 7611(a)(2). (Docket No. 58 at 7-13). The Court finds those arguments to be without merit. Since Bowman has not raised the issue of retroactivity at any point in this litigation, he has waived any argument to the effect that the apparent retroactive application of Appendix A violated the Due Process Clause. *Anspach v. City of Philadelphia*, 503 F.3d 256, 258, n. 1 (3d Cir. 2007). The issue of retroactivity is not before the Court, and no opinion is expressed as to how it would be resolved if it had been properly raised and briefed in this case.

Under the present circumstances, Bowman cannot establish an underlying violation of the Due Process Clause. Consequently, the Defendants are entitled to summary judgment with respect to Bowman's claims under that constitutional provision.

### B.     The Equal Protection Clause

Bowman alleges that Lizik, Christie and Miller violated his rights under the Equal Protection Clause. (Docket No. 1 at ¶¶ 37-39). He argues that he was treated differently than other police officers who had engaged in similar forms of misconduct.[17] (Docket No. 58 at 10-

---

[17]Bowman's accessing of Jodi's personal email account was not the only misconduct that Bowman was alleged to have engaged in. In his Disciplinary Action Report ("DAR") of September 2, 2005, Lizik stated that Bowman had inappropriately viewed approximately 500 pornographic images on a state-issued computer,

11). The jurisprudence of the Supreme Court has made it clear that the Equal Protection Clause limits the actions of executive officials as well as the permissible scope of legislative enactments. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886). The central purpose of the Equal Protection Clause is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Company v. Dakota Company*, 260 U.S. 441, 445 (1923). In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court recognized that discrimination against a particular individual (i.e., discrimination against a "class of one") violates the Equal Protection Clause when it bears no rational relationship to any legitimate governmental interest. Bowman bases his Equal Protection Clause claims on the "class of one" theory discussed by the Supreme Court in *Olech*. (Docket No. 58 at 10).

Earlier this year, the Supreme Court issued its decision in *Engquist v. Oregon Department of Agriculture*, 128 S.Ct. 2146, 2148-2149 (2008), holding that the "class of one" theory of equal protection "has no place in the public employment context." Bowman implicitly acknowledges that his Equal Protection Clause claims are foreclosed by *Engquist*, and he makes no attempt to distinguish the facts of this case from the facts in *Engquist*. (Docket No. 61 at 8). The Court can find no basis for permitting Bowman to proceed under the Equal Protection

---

improperly permitted Jodi to view a confidential criminal investigation report, and wrongfully accessed information about Jodi by using computer databases that were generally accessible only for legitimate police-related purposes. (Docket No. 52-4 at 2). Lizik also observed that Bowman had spent time kissing, hugging and fondling Jodi inside of his police vehicle when he was supposed to be performing job-related tasks. (*Id.*). The Court does not focus on these additional allegations of misconduct because they are not germane to the question of whether Bowman's discharge was effectuated in a constitutionally permissible manner.

Clause.[18]  He does not allege that he was "arbitrarily classified" as a member of an "identifiable group."[19]  *Engquist*, 128 S.Ct. at 2152-2153.  In *Engquist*, the Supreme Court explained that the "class of one" theory of equal protection is inapplicable to the public employment context because "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify."  *Id.* at 2154.  This Court "is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."  *Bishop v. Wood*, 426 U.S. 341, 349 (1976).  Accordingly, Lizik, Christie and Miller are entitled to summary judgment with respect to Bowman's claims under the Equal Protection Clause.

## V.    Conclusion

The Defendants base their entire argument on the defense of qualified immunity, without

---

[18]The Court acknowledges that Bowman was not an at-will employee, and that the PSP was permitted to discharge him only for cause.  Nevertheless, there is nothing in *Engquist v. Oregon Department of Agriculture*, 128 S.Ct. 2146 (2008), which suggests that the rule established in that case is limited to at-will employment situations. The Supreme Court specifically observed that Congress and the States had generally "replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons."  *Engquist*, 128 S.Ct. at 2156.  The Supreme Court went on to state, however, that a government's decision to limit the ability of a public employer to fire its employees at will was "an act of legislative grace," not a "constitutional mandate."  *Id.* The holding in *Engquist* broadly stated that the "'class-of-one' theory of equal protection has no place in the public employment context," without regard to whether the particular employee in question is an at-will employee.  *Id.* at 2148-2149.

[19]In his latest supplemental brief, Bowman vaguely intimates that his Equal Protection Clause claims are not foreclosed by *Engquist* because the "underlying factual background" is replete with "gender implications."  (Docket No. 68 at 3).  It is true that gender classifications trigger a heightened level of judicial scrutiny under the Equal Protection Clause.  *Mississippi University for Women v. Hogan*, 458 U.S. 718, 723-724 (1982).  The problem with Bowman's argument, however, is that he does not allege that the PSP discriminated against him because of his gender.  Instead, he makes the more generalized allegation that the PSP treated him more harshly than similarly situated police officers without having a "rational basis" for doing so.  (Docket No. 1 at ¶ 38).  Bowman cannot obtain a heightened level of judicial scrutiny (or escape the holding in *Engquist*) by showing that the "factual background" to this case had some relationship to "gender" or "sex" in an abstract sense.  The Equal Protection Clause provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., AMEND. XIV, § 1.  When determining the level of scrutiny to be applied in a given case, a court must consider whether the *State* has acted on the basis of gender, not whether the actions of the allegedly aggrieved individual had some relationship to "gender" or "sex."  Under the present circumstances, it is clear that Bowman cannot establish a violation of the Equal Protection Clause.

regard to whether Bowman can establish a constitutional violation in the first place. (Docket No. 53 at 5-10). Having reviewed the record in detail, the Court has determined that Bowman cannot establish a violation of the Fourteenth Amendment. There is no need for further inquiry. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). It suffices to say that the discharge at issue did not contravene the Constitution of the United States. The Defendants are entitled to summary judgment.

Accordingly, IT IS HEREBY ORDERED that the Defendants' Motion for Summary Judgment (*Docket No. [52]*) is **GRANTED**.

BY THE COURT:

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: December 30, 2008

cc/ecf: All counsel of record